2026 IL App (1st) 240996-U

No. 1-24-0996

Order filed July 31, 2026

Sixth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 22 CR 9036 |
| | ) | |
| MARTIN TORRES, | ) | Honorable |
| | ) | Timothy Joseph Joyce, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE C.A. WALKER delivered the judgment of the court.
Justices Pucinski and Gamrath concurred in the judgment.

**ORDER**

¶ 1    *Held*:   We affirm defendant's conviction for first degree murder over defendant's claim that the trial court committed reversable error by refusing to instruct the jury on the lesser-included offense of involuntary manslaughter.

¶ 2    Following a jury trial, defendant was found guilty of first degree murder and personally discharging the firearm that caused the victim's death and sentenced to 45 years in prison. On appeal, defendant argues that the trial court erred in rejecting his proposed jury instruction on the lesser-included offense of involuntary manslaughter. For the following reasons, we affirm.

¶ 3                                    BACKGROUND

¶ 4      Defendant was charged with six counts of first degree murder for the shooting death of Christopher Torrijos-Vega on September 16, 2021. Counts I through III charged that defendant intentionally or knowingly, without lawful justification, shot and killed Torrijos-Vega while armed with a firearm (count I), and personally discharged the firearm (count II), and the discharge proximately caused death (count III) (720 ILCS 5/9-1(a)(1) (West 2020)). Counts IV through VI charged that defendant, without lawful justification, shot and killed Torrijos-Vega while armed with a firearm, knowing that doing so created a strong probability of death or great bodily harm to Torrijos-Vega (Count IV), and personally discharged the firearm (count V), and the discharge proximately caused death (count VI) (720 ILCS 5/9-1(a)(2) (West 2020)).

¶ 5      Before trial, defendant raised the affirmative defenses of self-defense and defense of others.

¶ 6      At trial, Olivia Carmargo testified that on September 16, 2021, Torrijos-Vega drove her and two other friends to a Mexican Independence Day celebration in a Jewel-Osco parking lot on South Canal Street in Chicago, Illinois. They had no firearms with them. At around 10:30 p.m., Carmargo and her friends attempted to leave the parking lot in Torrijos-Vega's vehicle, but stopped the vehicle because a truck with a group of people was behind them. When they stopped, a man wearing a black shirt (subsequently identified as Miguel Torres (Miguel), defendant's brother) approached and started yelling and banging on the vehicle. Carmargo and Torrijos-Vega exited the vehicle and attempted to calm Miguel down, explaining that they were trying to leave. Miguel said he was an "SD" and "just repping his gang." Torrijos-Vega replied that he was a "neutron," meaning that he was not in a gang. Miguel pushed Carmargo away and punched Torrijos-Vega in the face. At that point, Torrijos-Vega and Miguel began pushing and wrestling with each other. A

few seconds later, a man wearing a red shirt (subsequently identified as defendant) ran in front of Carmargo and gestured at his waistband. Carmargo saw defendant join the fight with a firearm in his hand.

¶ 7    Carmargo testified that defendant and Miguel appeared to be winning throughout the fight. She then heard a popping sound from the fight's direction. Defendant subsequently picked something up and ran off with Miguel, while Torrijos-Vega stumbled and "hit the floor." Carmargo spoke with a woman in the parking lot who had recorded the incident and sent Carmargo the video. Random people also sent her videos of the incident.

¶ 8    On cross-examination, Carmargo testified that the Jewel-Osco parking lot was full of people with flags, fireworks, and firearms before and during the incident. She clarified that when Miguel approached the vehicle, he did not demand that Carmargo or Torrijos-Vega leave the vehicle or challenge them to a fight.

¶ 9    Federico Cisneros testified that he was Torrijos-Vega's close friend. He "[v]aguely" remembered the events of September 16, 2021. That day, Cisneros met up with Torrijos-Vega and Carmargo, as well as one of Carmargo's friends, and they drove around the city before joining the celebration at the Jewel-Osco parking lot. Cisneros was driving Torrijos-Vega's vehicle and attempting to leave the parking lot when two individuals "flashed their weapons" and told Cisneros and his companions to exit the vehicle. One individual wore a black T-shirt (Miguel) and the other a red T-shirt (defendant). Cisneros clarified that when they first approached the vehicle, he only saw Miguel with a firearm in his hand and not defendant.

¶ 10    Cisneros, Torrijos-Vega, and Carmargo exited the vehicle and attempted to deescalate the situation. Miguel punched Torrijos-Vega, and a fight started. Defendant was "trying to back up"

Miguel. Cisneros attempted to break up the fight, but defendant pointed his firearm at him and told him to stay back, which he then did. Cisneros testified that Torrijos-Vega was shot but Cisneros did not see who shot him. He later viewed cell phone videos of the incident.

¶ 11    On cross-examination, Cisneros amended his prior testimony to state that Miguel was alone when Torrijos-Vega exited his vehicle. He confirmed that, in the videos, Miguel did not brandish or possess a weapon at any point.

¶ 12    Chicago Police Department officer Sergio Aponte testified that, at the time of the shooting, he was a patrol officer assigned to the area of the crime scene. A coworker showed him "a widely spread video of the incident" circulating on social media. Based on general interactions he had with defendant while working in the area, Aponte recognized the man in the red shirt in the video as defendant. He also identified defendant as the person shown in a "seeking to identify" flyer relating to a September 16, 2021, homicide, which was posted on the wall in the police station.

¶ 13    The State presented two video recordings of the incident, which the court entered the into evidence without objection. The videos are included in the record on appeal and have been viewed by this court. The videos depict the incident from two different angles and for different durations.

¶ 14    In the first video, Carmargo, Torrijos-Vega, and Miguel are standing near each other surrounded by vehicles. Torrijos-Vega is larger than Miguel. Carmargo walks away and says, "he got a strap," to which an unseen person replies, "we all got straps around here." Torrijos-Vega and Miguel separate and walk in different directions. Cisneros appears in view, and he and Carmargo enter a vehicle and drive a few feet forward before stopping and exiting the vehicle. The camera moves to the driver's side of the vehicle, where Torrijos-Vega and Miguel again stand near each

other. Cisneros says something to Miguel. Torrijos-Vega then steps between those two men and says, "Hey. Peace. Peace. Peace. Hey."

¶ 15    Miguel circles the group and pushes Carmargo backward into Cisneros, and both remain standing next to their vehicle. Torrijos-Vega steps forward and Miguel pushes him lightly. Carmargo grabs Torrijos-Vega's arm and tries to pull him back while Torrijos-Vega leans toward Miguel. Miguel places a hand on Torrijos-Vega's chest, stating "I'm a SD" and raising a fist to head-level. Torrijos-Vega responds, "I don't give a f***. I'm a neutron. You gonna take a neutron? You gonna take a neutron?" Miguel then punches Torrijos-Vega in the face.

¶ 16    Miguel and Torrijos-Vega grab each other and wrestle while defendant emerges from the crowd near Torrijos-Vega. Defendant is carrying a firearm in his left hand as he approaches, and then punches Torrijos-Vega in the back of the head, knocking Torrijos-Vega down. Miguel throws another punch at Torrijos-Vega's head while Torrijos-Vega is on the ground. Torrijos-Vega then stands up. Defendant pushes Miguel away from Torrijos-Vega, and Miguel returns to Torrijos-Vega. At this point, defendant has the firearm near his waistband in his right hand, which is pointed to the ground while he attempts to wrestle Torrijos-Vega with his other hand.

¶ 17    Torrijos-Vega lands a punch on Miguel, who fights back for a moment before defendant places himself between the two. Someone says, "back up, back up." As the camera backs away from the fight, Cisneros walks into frame and at times blocks the camera's view of defendant, Miguel, and Torrijos-Vega. A physical struggle involving defendant, Miguel, and Torrijos-Vega continues. Defendant raises his right arm before Cisneros blocks the camera's view. A popping sound is heard, and people immediately start swearing. Seconds later, the video blurs and ends.

¶ 18    In the second video, defendant and Miguel are seen from a distance grabbing or punching at Torrijos-Vega. Defendant raises the firearm in his right hand near shoulder level and points it at Torrijos-Vega, who was standing. A popping sound is heard, after which Torrijos-Vega drops to the ground, attempts to stand, slumps backwards, and lays flat on the ground. Defendant picks something up from the ground and walks away.

¶ 19    Dr. Michael Eckhardt of the Cook County Medical Examiner's Office testified regarding Torrijos-Vega's autopsy. Torrijos-Vega weighed 356 pounds and measured 74 inches in length. Dr. Eckhardt explained that there was an entrance wound to Torrijos-Vega's face, the bullet traveled into his neck, exited his neck, and re-entered at his chest where it was retained. He opined that Torrijos-Vega died from "a gunshot wound of the face into the chest" and the manner of death was homicide.

¶ 20    Defendant testified that he had a firearm with him the night of the incident "for safety" and protection. He acknowledged he had a 2019 conviction for unlawful possession of a firearm and was not legally permitted to carry a firearm.

¶ 21    Defendant was in the Jewel-Osco parking lot with "a group of guys." He saw multiple people with firearms at the Independence Day celebration in the parking lot and heard gunshots around him. People were celebrating and shooting in the air. After hearing the gunshots, defendant retrieved his firearm from his vehicle and placed it in his waistband.

¶ 22    As defendant carried a battery generator to his vehicle, he heard a familiar voice and noticed his brother Miguel, unaccompanied, arguing with a few people, including someone "over 300 pounds" (Torrijos-Vega). Defendant thought that Miguel was in trouble, dropped the generator, and ran to Miguel to make sure he was all right.

¶ 23    As defendant ran to Miguel, his firearm was tucked in his waistband and was "slipping out so [he] had to grab it before it fell." When he first arrived on the scene, the fight was already in progress. He saw "a huge guy trying to beat [his] brother up." Defendant thought that Miguel was "gonna get hurt" and was in trouble.

¶ 24    Defendant punched Torrijos-Vega, who fell. Defendant told the many people nearby to "back up, back up, let them be." He turned around and saw a "scruffle [*sic*] on the floor." Defendant testified, "[a]s I was trying to tell [Cisneros] to grab his friend, the fight broke onto me, and I turned around and my reaction." Defendant had the firearm in his hand, it discharged, and it hit someone. He believed Miguel was by himself and in trouble, and feared Miguel would be seriously injured based on Torrijos-Vega's size. Torrijos-Vega was "huge," not obeying defendant's commands, and no one else attempted to break up the fight.

¶ 25    On cross-examination, defendant testified that, after hearing the gunshots, he tried to leave but had to help his friend with his vehicle. Defendant brought the firearm to the parking lot for safety and had it in his waistband when he was helping his friend. He saw a few people with firearms across the street, about 20 to 15 feet away. Defendant did not see Torrijos-Vega or his friends with firearms.

¶ 26    Defendant believed that Torrijos-Vega was "400 pounds" and had an advantage over Miguel, even when knocked to the ground. The first thing that defendant did was punch Torrijos-Vega in the back of the head, and Torrijos-Vega fell. After defendant told the people nearby to back up, he started hitting Torrijos-Vega again, believing Torrijos-Vega was on top of Miguel. Defendant did not tell Torrijos-Vega to stop because "[i]t was obvious [defendant] had a gun in

[his] hand." He was "pretty sure" Torrijos-Vega saw the firearm in his hand when he was down on the ground. Defendant was not pointing the firearm, which was down at his side.

¶ 27    Defendant testified that he had put 10 bullets in his semiautomatic firearm, but then testified that he did not know how many bullets were in his firearm. He explained that a bullet is loaded into the firing chamber of a semiautomatic firearm from the magazine by "cocking it" or "pulling back on the barrel." He denied "cocking" the firearm to load a bullet into the chamber when Torrijos-Vega was on the ground and did not know one was in there. He confirmed he pulled the trigger, and explained "[i]t was a reaction." Defendant acknowledged that Torrijos-Vega was shot in the face, but denied pointing his firearm at Torrijos-Vega's head.

¶ 28    The parties stipulated that Cisneros did not inform a police detective during an interview that two individuals with firearms approached him while seated in the driver's seat of a vehicle and ordered him to exit.

¶ 29    At the jury instruction conference, defendant requested instructions on second degree murder and defense of others. Defendant's counsel argued that there was some evidence supporting the conclusion that defendant acted out of fear for Miguel's safety when firing the firearm, given Torrijos-Vega's weight and size. The court remarked that defendant did not say why he discharged the firearm or that he discharged it intentionally or negligently but rather "said I reacted." The court elaborated that it did not hear testimony from defendant regarding "a reasonable belief that some other person is going to use deadly force" or that he unreasonably believed "that deadly force was necessary because of what [he] perceived someone else was about to do." Defense counsel disagreed and then requested an involuntary manslaughter instruction.

¶ 30    Defense counsel argued that it was reckless to have a firearm, point it at someone, and have it discharge.

¶ 31    The court found the instructions for defense of self and others and involuntary manslaughter inconsistent. Defense counsel explained that "pointing a loaded weapon at another constitutes recklessness as it is a gross deviation from the standard of care exercised by a reasonable person" and the conduct defendant described—"that the gun went off"—fit within recklessness. The court disagreed, stating that defendant "didn't testify that the gun went off" but that "he reacted," which suggested that "he fired the gun." The court elaborated that "[t]here is no evidence that [defendant] is claiming that the gun went off." The trial court approved use of the defense of others and second degree murder instructions but rejected the involuntary manslaughter instruction.

¶ 32    The jury found defendant guilty of first degree murder and that he personally discharged a firearm that proximately caused the victim's death.

¶ 33    Defendant filed a motion for a new trial, arguing, *inter alia*, that the trial court erred in refusing his involuntary manslaughter instruction. The court denied the motion, explaining that in its estimation, "there was no evidence by which this jury or any jury could rationally conclude that [defendant] was guilty of involuntary manslaughter rather than first-degree murder or second-degree murder which the jury was instructed on."

¶ 34    The court merged the strong probability murder count (Count VI) into the intentional murder count (Count III) (720 ILCS 5/9-1(a)(1) (West 2020)) and sentenced defendant to 20 years in prison for the murder, plus the 25-year mandatory sentence enhancement for personally

discharging the firearm that proximately caused the victim's death (730 ILCS 5/5-8-1(a)(i)(d) (West 2020)), for a total of 45 years in prison.

¶ 35                                    ANALYSIS

¶ 36    On appeal, defendant contends that the trial court erred in rejecting his proposed jury instruction for the lesser-included offense of involuntary manslaughter because there was some evidence to support his argument that he exhibited reckless conduct when discharging the firearm.

¶ 37    A criminal defendant is entitled to a lesser-included offense jury instruction where there is "*some evidence* in the record that, if believed by the jury, will reduce the crime charged to a lesser offense." (Emphasis in original.) *People v. McDonald*, 2016 IL 118882, ¶ 25. The trial court does not weigh the evidence or evaluate the credibility of such evidence in making this determination. *Id*. We review the trial court's decision that "insufficient evidence exists to support the giving of a lesser-included offense jury instruction" for an abuse of discretion. *People v. Himber*, 2020 IL App (1st) 162182, ¶ 30. Accordingly, this court may only disturb the trial court's judgment where it is arbitrary, fanciful, or patently unreasonable. *Id*. Failure to give a jury instruction where some evidence supports such instruction is an abuse of discretion. *People v. Lee*, 2015 IL App (1st) 132059, ¶ 73.

¶ 38    Involuntary manslaughter is a lesser-included offense of first degree murder. *Himber*, 2020 IL App (1st) 162182, ¶ 31. A lesser-included offense is an offense that "[i]s established by proof of the same or less than all of the facts of a less culpable mental state (or both), than that which is required to establish the commission of the offense charged." 720 ILCS 5/2-9 (West 2020). The defendant's mental state differentiates first degree murder from involuntary manslaughter. *McDonald*, 2016 IL 118882, ¶ 51.

- 10 -

¶ 39    As charged here, a defendant commits first degree murder where he kills another individual without lawful justification intending to kill or do great bodily harm to that individual or another, or knowing that such acts will cause death to that individual or another (720 ILCS 5/9-1(a)(1) (West 2020)), or knowing his conduct has a strong probability of causing death or great bodily harm to the individual or another (720 ILCS 5/9-1(a)(2) (West 2020)). In comparison, "[a] person who unintentionally kills an individual without lawful justification commits involuntary manslaughter if his acts whether lawful or unlawful which cause the death are such as are likely to cause death or great bodily harm to some individual, and he performs them recklessly." *Id*. § 9-3(a).

¶ 40    Reckless conduct is defined as conduct by which a defendant "consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense, and that disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." *Id*. § 4-6; *McDonald*, 2016 IL 118882, ¶ 50. A person acts recklessly " 'when he is aware that his conduct might result in death or great bodily harm, although that result is not substantially certain.' " *People v. Hayes*, 409 Ill. App. 3d 612, 621 (2011) (quoting *People v. DiVincenzo*, 183 Ill. 2d 239, 250 (1998)). The following non-dispositive factors may be considered to determine "whether an involuntary manslaughter jury instruction is warranted: (1) the disparity of size and strength between the defendant and the victim, (2) the duration of the altercation and the severity of the victim's injuries, (3) whether the defendant used a weapon, (4) whether the defendant inflicted multiple wounds, and (5) whether the victim was defenseless." *McDonald*, 2016 IL 118882, ¶ 52.

¶ 41     A defendant is generally not entitled to an involuntary manslaughter instruction when the nature of the killing demonstrates that the defendant acted intentionally or knowingly rather than recklessly. *Himber*, 2020 IL App (1st) 162182, ¶ 31. Whether to instruct the jury on involuntary manslaughter must be determined based on the facts and circumstances of each case. *Id*. If some evidence is introduced that would reduce the crime to involuntary manslaughter, if believed by the jury, a defendant charged with first degree murder is entitled to an instruction on involuntary manslaughter. *People v. Austin*, 207 Ill. App. 3d 896, 899 (1990). However, where a defendant points a firearm in the general direction of his target, intends to discharge that firearm, and actually does so, the conduct is not merely reckless and an involuntary manslaughter instruction is not warranted by the nature of the killing, regardless of whether the defendant asserts he did not intend to kill anyone. *People v. Sipp*, 378 Ill. App. 3d 157, 164 (2007); see *People v. Jackson*, 372 Ill. App. 3d 605, 613-14 (2007) ("[A] defendant is not entitled to reduce first degree murder to a Class 1 felony by a hidden mental state known only to him and unsupported by the facts.").

¶ 42     Here, the trial court did not abuse its discretion in refusing the proposed involuntary manslaughter instruction. The video evidence shows defendant raising his firearm at the standing Torrijos-Vega, a shot sounding, and Torrijos-Vega falling to the ground, shot in the head according to the autopsy report. This is not evidence that defendant acted recklessly. See *Sipp*, 378 Ill. App. 3d 157 at 164-65. By raising his firearm to shoulder height and discharging it at Torrijos-Vega, defendant engaged in conduct the natural tendency of which was to cause death or great bodily harm to another, and that conduct did not warrant an involuntary manslaughter instruction. *Id*. at 164.

¶ 43     Defendant contends that his testimony showed that he did not deliberately shoot Torrijos-Vega, which provided some evidence that, if believed, showed he acted recklessly in handling his firearm. Defendant claims "he did not know" that the firearm was in a firing position while fighting with Torrijos-Vega, he "did not intentionally point" his firearm at Torrijos-Vega, and he did not intend to discharge the firearm at Torrijos-Vega. However, defendant's testimony did not provide any such evidence.

¶ 44     Defendant testified he retrieved the loaded firearm from his vehicle after hearing gunshots and observing individuals with firearms. He had the firearm with him for safety and acknowledged that Torrijos-Vega and his friends had no firearms. Defendant approached the physical altercation occurring between Miguel and Torrijos-Vega with his firearm in hand and visible. Defendant confirmed that he pulled the firearm's trigger and that Torrijos-Vega was shot in the face.

¶ 45     As to how it happened, defendant testified that "the fight broke onto me, and I turned around and my reaction." But he ended the sentence there and did not elaborate regarding his "reaction." He subsequently admitted he pulled the firearm's trigger and stated it was "a reaction" but again without explanation and without claiming it was an accidental discharge. See *People v. Beasley*, 2014 IL App (4th) 120774, ¶¶ 5, 25 (evidence of a provocation by the victim warranted involuntary manslaughter instruction where the firearm "accidentally" discharged into a crowd). Moreover, there is no testimony that defendant and Torrijos-Vega engaged in a struggle over the firearm causing it to discharge. See *People v. Haynes*, 2024 IL 129795, ¶ 46 (finding no evidence of mutual combat or struggle over a weapon which might have supported involuntary manslaughter instruction). Rather, the video evidence demonstrated that defendant raised his firearm and pointed it at Torrijos-Vega, and the autopsy evidence showed defendant shot Torrijos-Vega in the head.

Defendant's claim that he did not aim at Torrijos-Vega and did not intentionally discharge his firearm, alone, is not evidence which can support an involuntary manslaughter instruction in this case. *Sipp*, 378 Ill. App. 3d at 164.

¶ 46    Accordingly, the trial court did not abuse its discretion in rejecting the proffered involuntary manslaughter jury instruction. We therefore need not address defendant's harmless error contentions as there was no error. *People v. Nash*, 2012 IL App (1st) 093233, ¶ 33.

¶ 47                                           CONCLUSION

¶ 48    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 49    Affirmed.